UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| Sanhua (Hangzhou) Micro Channel Heat Exchanger Co., Ltd.<br><br>Plaintiffs,<br><br>v.<br><br>United States. | Court No. 26-05203<br><br>Complaint |

# COMPLAINT

Plaintiffs Sanhua (Hangzhou) Micro Channel Heat Exchanger Co., Ltd.("Sanhua") by and through their attorneys, alleges and states the following claims against the defendant United States.

## ADMINISTRATIVE DETERMINATION TO BE REVIEWED

1. Plaintiff brings this complaint to contest the final scope ruling issued by the U.S. Department of Commerce, International Trade Administration ("the Department"), in the scope inquiry with respect to the Antidumping Duty ("AD")) and Countervailing Duty ("CVD") Orders of aluminum extrusions from the People's Republic of China (China). See October 15, 2026 Memorandum from Mason Harkleroad, International Trade Compliance Analyst, Office VI to Scot Fullerton Acting Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, Aluminum Extrusions from the People's Republic of China: Final Scope

Ruling on Sanhua's Micro Channel Heat Exchangers ("Final Scope Ruling").

**JURISDICTION**

2. This action is brought pursuant to the authority of 19 U.S.C. § 1516a(a)(2)(B)(vi) to contest the Final Scope Ruling issued by the Department. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1581(c).

**STANDING**

3. Plaintiff Sanhua is Producer, Exporter and U.S. importer of product subject to the Final Scope Ruling. Plaintiff participated in the Department's proceeding that resulted in the challenged determination and is subject to the Final Scope Ruling. Therefore, Plaintiffs are interested parties as described in 19 U.S.C. §1677(9)(A) and have standing to bring this action pursuant to 28 U.S.C. § 2631(c) and 19 U.S.C. §1516a(d).

**TIMELINESS OF THIS ACTION**

4. The contested Final Scope Ruling was dated October 15, 2026, and was served by certified mail on October 20, 2026. Plaintiffs commenced this action by filing a Summons on November 13, 2026, which was within thirty days after the date of the date of service of the Final Ruling by Certified Mail. Plaintiffs are filing this complaint on November 13, 2026, which is within thirty days from the date of the filing of the Summons. Therefore, both the Summons and Complaint have been timely filed pursuant to Rules 3(a)(2) and 6(a) of the Rules of this Court and

Section 516A(a)(2)(A)(ii) of the Tariff Act (19 U.S.C. § 1516a(a)(2)(A)(ii).

## BACKGROUND

5. On May 26, 2011, the Department published AD/CVD orders on Aluminum Extrusions from the People's Republic of China ("**Extrusion I**"). 76 FR 30650 and 76 FR 30653 ("the Orders").

6. Scope of the Orders:

The merchandise covered by these Orders is aluminum extrusions which are shapes and forms, produced by an extrusion process, made from aluminum alloys having metallic elements corresponding to the alloy series designations published by The Aluminum Association commencing with the numbers 1, 3, and 6 (or proprietary equivalents or other certifying body equivalents). Specifically, the subject merchandise made from aluminum alloy with an Aluminum Association series designation commencing with the number 1 contains not less than 99 percent aluminum by weight. The subject merchandise made from aluminum alloy with an Aluminum Association series designation commencing with the number 3 contains manganese as the major alloying element, with manganese accounting for not more than 3.0 percent of total materials by weight. The subject merchandise is made from an aluminum alloy with an Aluminum Association series designation commencing with the number 6 contains magnesium and silicon as the major alloying elements, with magnesium accounting for at least 0.1 percent but not more than 2.0 percent

of total materials by weight, and silicon accounting for at least 0.1 percent but not more than 3.0 percent of total materials by weight. The subject aluminum extrusions are properly identified by a four-digit alloy series without either a decimal point or leading letter. Illustrative examples from among the approximately 160 registered alloys that may characterize the subject merchandise are as follows: 1350, 3003, and 6060.

Aluminum extrusions are produced and imported in a wide variety of shapes and forms, including, but not limited to, hollow profiles, other solid profiles, pipes, tubes, bars, and rods. Aluminum extrusions that are drawn subsequent to extrusion ("drawn aluminum") are also included in the scope.

Aluminum extrusions are produced and imported with a variety of finishes (both coatings and surface treatments), and types of fabrication. The types of coatings and treatments applied to subject aluminum extrusions include, but are not limited to, extrusions that are mill finished (i.e., without any coating or further finishing), brushed, buffed, polished, anodized (including bright dip anodized), liquid painted, or powder coated. Aluminum extrusions may also be fabricated, i.e., prepared for assembly. Such operations would include, but are not limited to, extrusions that are cut-to-length, machined, drilled, punched, notched, bent, stretched, knurled, swedged, mitered, chamfered, threaded, and spun. The subject merchandise includes aluminum extrusions that are finished (coated, painted, etc.),

fabricated, or any combination thereof.

Subject aluminum extrusions may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, window frames, door frames, solar panels, curtain walls, or furniture. Such parts that otherwise meet the definition of aluminum extrusions are included in the scope. The scope includes the aluminum extrusion components that are attached (e.g., by welding or fasteners) to form subassemblies, i.e., partially assembled merchandise unless imported as part of the finished goods 'kit' defined further below. The scope does not include the non-aluminum extrusion components of subassemblies or subject kits.

Subject extrusions may be identified with reference to their end use, such as fence posts, electrical conduits, door thresholds, carpet trim, or heat sinks (that do not meet the finished heat. sink exclusionary language below). Such goods are subject merchandise if they otherwise meet the scope definition, regardless of whether they are ready for use at the time of importation.

The following aluminum extrusion products are excluded: Aluminum extrusions made from aluminum alloy with an Aluminum Association series designations commencing with the number 2 and containing in excess of 1.5 percent copper by weight; Aluminum extrusions made from aluminum alloy with an Aluminum Association series designation commencing with the number 5 and

containing in excess of 1.0 percent magnesium by weight; and aluminum extrusions made from aluminum alloy with an Aluminum Association series designation commencing with the number 7 and containing in excess of 2.0 percent zinc by weight.

The scope also excludes finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels. The scope also excludes finished goods containing aluminum extrusions that are entered unassembled in a "finished goods kit." A finished goods kit is understood to mean a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, such as cutting or punching, and is assembled "as is" into a finished product. An imported product will not be considered a "finished goods kit" and therefore excluded from the scope of these Orders merely by including fasteners such as screws, bolts, etc. in the packaging with an aluminum extrusion product.

The scope also excludes aluminum alloy sheet or plates produced by other than the extrusion process, such as aluminum products produced by a method of casting. Cast aluminum products are properly identified by four digits with a

decimal point between the third and fourth digit. A letter may also precede the four digits. The following Aluminum Association designations are representative of aluminum alloys for casting: 208.0, 295.0, 308.0, 355.0, C355.0, 356.0, A356.0, A357.0, 360.0, 366.0, 380.0, A380.0, 413.0, 443.0, 514.0, 518.1, and 712.0. The scope also excludes pure, unwrought aluminum in any form.

The scope also excludes collapsible tubular containers composed of metallic elements corresponding to alloy code 1080A as designated by the Aluminum Association where the tubular container (excluding the nozzle) meets each of the following dimensional characteristics: (1) Length of 37 mm or 62 mm, (2) outer diameter of 11.0 mm or 12.7 mm, and (3) wall thickness not exceeding 0.13 mm.

Also excluded from the scope of these Orders are finished heat sinks. Finished heat sinks are fabricated heat sinks made from aluminum extrusions the design and production of which are organized around meeting certain specified thermal performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements.

Also excluded from the scope of the Orders is certain rectangular wire, imported in bulk rolls or precut strips and produced from continuously cast rolled aluminum wire rod, which is subsequently extruded to dimension to form rectangular wire with or without rounded edges.The product is made from aluminum alloy grade 1070 or 1370, with no recycled metal content allowed. The

dimensions of the wire are 2.95 mm to 6.05 mm in width, and 0.65 mm to 1.25 mm in thickness. Imports of rectangular wire are provided for under HTSUS categories 7605.19.000, 7604.29.1090, or 7616.99.5190

7. On September 15, 2025, the Aluminum Extrusion Fair Trade Committee ("AEFTC", or "Petitioner") filed a scope ruling application requesting that the Department determines whether MCHEs produced by Sanhua are covered by the scope of the Orders ("Scope Ruling Application").

8. On September 24, 2025, Sanhua filed an objection to the Scope Ruling Application. On September 25, 2025, Daikin Comfort Technologies ("Daikin") submits deficiency comments on the Scope Ruling Application. Both requested the Department to reject the application.

9. On December 19, 2025, the Department accepted the scope application and initiated a scope inquiry.

10. On January 27, 2026, Sanhua filed comments on the Petitioner's Scope Ruling Application. On January 27, 2026, Daikin, Danfoss LLC ("Danfoss"), Modine Manufacturing Company ("Modine"), and JC Residential and Light Commercial LLC ("JC Residential") (collectively, "DDMJ") filed comments on the Petitioner's Scope Ruling Application.

On January 27, 2026, Danfoss, Modine, and JC Residential filed additional comments on the Petitioner's Scope Ruling Application. On February 5, 2026,

Sanhua filed rebuttal comments in response to Danfoss, Modine, and JC Residential's comments.

On February 17, 2026, the petitioner filed rebuttal comments in response to Daikin, Danfoss, Modine, JC Residential, and Sanhua's comments.

On March 12, 2026, DDMJ filed a notice of subsequent authority. On March 17, 2026, the petitioner filed rebuttal comments in response to DDMJ's notice of subsequent authority.

On June 22, 2026, the Department issued a supplemental questionnaire to the petitioner. On July 9, 2026, the petitioner submitted its response to the first supplemental questionnaire.

On July 28, 2026, Sanhua submitted rebuttal comments in response to the questionnaire. On July 28, 2026, DDMJ also submitted rebuttal comments in response to the questionnaire. On August 4, 2026, the petitioner filed rebuttal comments in response to Sanhua and DDMJ's comments.

On October 14, 2026, DDMJ filed a notice of subsequent authority.

11. On October 15, 2026 the Department issued the final scope ruling ("Final Ruling"), determining that the micro channel heat exchangers, are covered by the scope of the Orders and the scope ruling should be implemented on a country-wide basis, regardless of the producer, exporter, or importer of these products.

On October 22, 2026 Sanhua submitted Ministerial Error Comments on the Final Ruling.

12. On October 20, 2026, the Department placed the proof of mailing on October 20, 2026 on the record.

13. On October 23, 2026 the Department issued the cash deposit instruction to the CBP ("Cash Deposit Instruction") requesting AD/CVD deposit at the country-wide rate of 86.01%.

14. On October 26, 2026 Sanhua submitted Comment on the suspension date designated in the Cash Deposit Instruction ("Suspension Date Comment").

## STANDARD OF REVIEW

15. This Court reviews final determinations issued by the Department pursuant to 19 U.S.C. §1675(a) to determine whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19U.S.C.§1516a(b)(1)(B)(i)..

## CLAIMS

## COUNT ONE

**The Department's Final Ruling Improperly Revokes and Replaces the 2014 MCHEs Scope Ruling**

16. The allegations of paragraphs 1 through 15 are incorporated by reference and restated as if fully set forth herein.

17. The Final Ruling is implemented on a country-wide basis across producers based on a conclusion that MCHES are not different among producers (Final Ruling at 30-31). This effectively revokes and replaces the existing scope ruling on the same product. This is not supported by law and is contrary to the core legal principle of **Finality**.

18. The 2014 MCHEs Scope Ruling is final, has never been appealed to the court, and has remained in effect since it was issued. The scope is settled and cannot be re-litigated per the principle of Finality. The efforts to revoke and replace an existing scope ruling is thus unlawful and an abuse of discretion.

19. The Department's determination that the 2014 MCHEs Scope Ruling is no longer valid based on the so called "updated interpretation" is not in accordance with law.

20. The Department misread the 2014 MCHEs Scope Ruling in its Final Ruling by stating that 2014 MCHEs Scope Ruling determined the MCHEs as "subassemblies" (Final Ruling at 30-31). To the contrary, the 2014 MCHEs Scope Ruling reached the conclusion that MCHEs are "finished products" and thus meet the exclusion language.

**COUNT TWO**

**The Department failed to fully respond to the claims of contradiction between the Final Ruling and Extrusion II (Final Ruling at 32) and the partial response is contrary to the fact and law.**

21. The allegations of paragraphs 1 through 15 are incorporated by reference and restated as if fully set forth herein.

22. The Final Ruling is breaking the core legal principle of Estoppel. The Department did not respond to Sanhua's allegation on this issue in its Final Ruling.

23. The Petitioner repeatedly claimed that MCHEs in particular were not within the scope of Extrusion I throughout Extrusion II investigation.

24. The Department then issued Extrusion II final determination, accompanied in particular with a scope decision in order to clarify the ambiguous scope language.

25. Sanhua was the only PRC mandatory respondent with the sole subject merchandise of MCHEs in Extrusion II and was fully cooperating with the Department throughout the 14 months investigation, while Danfoss was also fully cooperating as an SRA respondent with its MCHEs. Both were assigned a separate AD/CVD rate by the Department and AD/CVD cash deposit were collected by the CBP on the MCHEs after the preliminary determination. It cannot be contested that MCHEs were covered by Extrusion II.

26. It is undisputed the MCHEs was covered by Extrusion II. The plain scope language of the exhaustive list of covered products and the AD/CVD deposit paid after the preliminary determination of Extrusion II should have made this undisputed.

27. The Extrusion II scope can only include or exclude MCHEs at the time of determination, not pending to any future scope ruling of other AD/CVD orders. The Extrusion II scope was determined (2024) earlier than this Final Ruling (2026). The Department's determination that the 2024 Extrusion II scope will preemptively exclude the MCHEs covered by this 2026 Final Ruling just does not make sense.

COUNT THREE

**The Final Scope Ruling results in imposing AD/CVD duty on non-injury products, which is not in accordance with law.**

28**.** The allegations of paragraphs 1 through 15 are incorporated by reference and restated as if fully set forth herein.

29. In the scenario that ITC injury decision remains negative, no AD/CVD duty should be imposed on the MCHEs. The laws only authorize the Department to impose AD/CVD duty on merchandise causing injury to domestic industry.

COUNT FOUR

**The Department making the Final Ruling while the appeal of ITC decision of Extrusion II is ongoing is unlawful.**

30. The allegations of paragraphs 1 through 15 are incorporated by reference and restated as if fully set forth herein.

31. The jurisdiction over the AD/CVD matter covering MCHEs from China rests with the court, not Commerce. The issue as to whether these products are subject to scope is subject to the ongoing appeal. The Department's decision to make a Final Ruling while the court appeal is ongoing is not in accordance with law.

COUNT FIVE

**The Department assigned an AFA rate to fully-cooperative parties, which is not in accordance with law.**

32. The allegations of paragraphs 1 through 15 are incorporated by reference and restated as if fully set forth herein.

33. The Department imposed through the Final Ruling a PRC-wide AD/CVD rate (see Cash Deposit Instruction at 3), which is a rate based on adverse facts available (AFA) rate and which is intended to be applicable to non-fully cooperative parties. This rate applied more broadly including all cooperative producers, exporters and importers including both Sanhua and Danfoss. An application of a rate based on AFA, and which cannot be reviewed due to temporal issues, is not in accordance with the law.

34. Any MCHEs exported/imported into the U.S. by the affected parties from May 1, 2025 through April 30, 2026 would fall under the 2025-2026 review

Extrusion I, the review period of which is May 1, 2025 through April 30, 2026. The deadline to request a review of such entries is not later than the last day of May 2026, a date significantly before the date of the Final Ruling. The affected parties had no legal authority and had no reason to request that the Department commence a review for the 25-26 POR before the end of May 2026.

35. The Department improperly rejected Danfoss request for an alternative date of suspension (Final Ruling at 33-35) and the Department did not respond to Sanhua's request.

COUNT SIX

**The determination that the MCHEs are "subassemblies" instead of "finished product" is not supported by evidence.**

36. The allegations of paragraphs 1 through 15 are incorporated by reference and restated as if fully set forth herein.

37. The trigger of this scope ruling, as well as many others regarding to the "subassemblies" is due to that the ambiguous language in Extrusion I scope, especially those on "subassemblies" inclusion and "finished product" exclusion. Based on legal doctrine of **Contra Proferentem,** the Petitioner should not benefit from ambiguity in the scope he drafted. The Department did not respond to Sanhua's comment on Contra Proferentem (Sanhua Jan 27, 2026 comment at 2-3).

38. The simple reason that the Department determined the MCHEs are "subassemblies" covered in the Extrusion I scope is that the MCHEs "have no standalone consumptive function and are intended solely to be incorporated into a larger finished product (Final Ruling at 27-29)". By doing so the Department ignored record evidence that the MCHEs is a finished product in the industry view and have its own consumptive function. (Sanhua July 28, 2026 Comment at 4 through 9).

39. That MCHEs are intended solely to be incorporated into a larger product is not contrary to its own consumptive function.

40. The determination ignored record evidence that the MCHEs is a finished product in terms of Extrusion scope (Sanhua July 28, 2026 Comment at 9 through 11).

41. The limitation on the finished product the Department imposed on the MCHEs is contrary to the exemplars for doors and windows that the scope used for the purpose of illustration.

42. The Department recognizes that the subassemblies language lacks express language supports an interpretation that products which satisfy the subassemblies language cannot be excluded under the finished merchandise exclusion (Final Ruling at 26). However, there are explicit examples for the "finished product" exclusion, i.e., the door with glass or vinyl, or a window with

glass. The later application or whether being used in a larger product is never mentioned in the finished product exclusion.

43. There is no evidence that all MCHEs are subassemblies. MCHEs are a wide category of products while only some of them were used in the HVAC or refrigeration systems. The party seeking the scope ruling, in this case the petitioner, has the duty to provide sufficient evidence to prove its application. Petitioner has not done so in this matter.

COUNT SEVEN

**The determination that the Mexico MCHEs are covered by the scope is not supported by evidence.**

44. The allegations of paragraphs 1 through 15 are incorporated by reference and restated as if fully set forth herein.

45. The determination that the MCHEs are not substantially transformed in Mexico is not supported by evidence.

46. The determination that the essential component of MCHEs is not transformed in Mexico is not supported by evidence.

47. The determination that the extent of the further processing is not sufficiently complex to confer country-of-origin status for the MCHEs on Mexico is not supported by evidence.

48. The determination that the value-added to the product in Mexico is not

significant is not supported by evidence.

COUNT EIGHT

**The interpretation of the subassemblies provision Commerce applied to the fully assembled MCHEs contravened the plain meaning and purpose of basic Tariff Act provisions governing the assessment of antidumping and countervailing duties.**

49. The allegations of paragraphs 1 through 15 are incorporated by reference and restated as if fully set forth herein.

50. Section 731 of the Tariff Act imposes, upon certain defined prerequisites, “an antidumping duty” upon “a class or kind of foreign merchandise “that is being, or is likely to be, sold in the United States at less than its fair value.”19 U.S.C. § 1673 (emphasis added). Similarly, section 701(a) of the Tariff Act imposes, upon certain defined prerequisites, “a countervailing duty . . . equal to the amount of the net countervailable subsidy” upon “a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States.” Id. § 1671(a) (emphasis added). The “class or kind of merchandise” sold or offered for sale in the United States is that which Commerce must define and address in an AD or CVD order. See id. § § 1673, 1673e(a) Thus, both the antidumping and the countervailing duty provisions of the Tariff Act are directed to “merchandise” that is considered to be unfairly traded, as a

result of dumping or a countervailable subsidy, upon being sold, or offered for sale, for importation into the United States.

51. In contrast, the Department's current interpretation of the Orders can result in the assessment of antidumping and countervailing duties on products that are not sold or offered for sale in the United States but instead are upstream components in the merchandise that actually is imported and sold. See The Mosaic Co. v. United States, 47 CIT __, __, 659 F. Supp. 3d 1285, 1294–95 (2023). In this case, the Department's interpretation of the subassemblies provision, as applied to the MCHEs will result in the assessment of antidumping and countervailing duties on an upstream, incorporated component (i.e., the aluminum extrusion component) of the merchandise that was imported and sold (i.e., the complete, assembled MCHEs, which is not an "aluminum extrusion" as defined in the Orders).

COUNT NINE

52. The allegations of paragraphs 1 through 15 are incorporated by reference and restated as if fully set forth herein.

53. The Department's determination that the ITC's description of heat sinks is not a relevant (k)(1) interpretive source requiring a finding that MCHEs are excluded merchandise (Final Ruling at 29-30) is not in accordance with law.

54. The Department's rejection to consider those scope rulings DDMJ and

Sanhua cited, which are in effect so far, is not in accordance with law (Final Ruling at 39).

**PRAYER FOR RELIEF**

WHEREFOR, the plaintiffs respectfully request that this Court enter judgment as follows:

1. Sustaining counts one to nine of plaintiffs' complaint;
2. Remanding this matter to the Department of Commerce for issuance of a determination consistent with the decision of this court;
3. Awarding attorney fees and costs; and
4. Providing such other relief as the court may deem just and appropriate.

Respectfully submitted,

/s/ David J. Craven

David J. Craven
Counsel to Tianjin Magnesium International Co., Ltd. and Tianjin Magnesium Metal Co., Ltd

Craven Trade Law LLC
3744 N Ashland
Chicago, IL 60613
(773) 709-8506
David.craven@tradelaw.com

Date November 13, 2026